IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JONATHAN PRITCHARD,     \*

          \*

    Plaintiff,     \*

          \*

vs.          \*     Civil Action No. 12-00167-B

          \*

CAROLYN W. COLVIN,[1]     \*

Commissioner of Social Security,\*

          \*

    Defendant.     \*

<u>ORDER</u>

Plaintiff Jonathan Pritchard (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On April 19, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 22). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security

Federal Rule of Civil Procedure 73. (Doc. 23).  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.  <u>**Procedural History**</u>

Plaintiff filed applications for supplemental security income and disability insurance benefits disability insurance benefits and alleged that his disability commenced on June 30, 2007. (Tr. 62, 67). His applications were denied on June 18, 2008 (<u>id.</u> at 18), and he timely filed a Request for Hearing on July 19, 2008. (<u>Id.</u>).  Plaintiff's initial hearing was held on January 7, 2010; however, Administrative Law Judge David R. Murchison (hereinafter "ALJ") postponed testimony and ordered a consultative examination for Plaintiff. (<u>Id.</u> at 250-53).  A subsequent hearing was conducted by the ALJ on June 23, 2010. (<u>Id.</u> at 254).  On June 25, 2010, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (<u>Id.</u> at 15-27). Plaintiff sought review before the Appeals Council, which denied his request for review. (<u>Id.</u> at 4).  Thus, the ALJ's decision dated June 25, 2010 became the final decision of the Commissioner. (<u>Id.</u> at 4-6).

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1).  The parties

2

waived oral argument and agree that this case is now ripe for judicial review by this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. Issue on Appeal

Whether the ALJ erred in finding that Plaintiff does not meet the requirements of Listing 12.03(c)?

## III. Factual Background

Plaintiff was born on June 14, 1988, and was 22 years of age at the time of his administrative hearing. (Tr. 257). Plaintiff stopped school in the ninth grade, and subsequent thereto, he took classes and passed some parts of the GED test; however, he has not earned his GED. (Id. at 257-58).  At the June 23, 2010 administrative hearing, Plaintiff testified that he last worked in 2007 through the Employer's Administrative Services, which placed him at Rooms To Go in a warehouse wrapping furniture and loading it on trucks. (Id. at 259). Plaintiff testified that he stopped working at the warehouse because his "stomach started hurting". (Id.).

According to Plaintiff, he is disabled because he has "a bad heart and [] paranoia". (Id. at 258).  Plaintiff testified that although he would like to work, he will probably not be able to because sometimes his medicine makes him drowsy. (Id. at 260-61).  He reported sleeping three hours during the day, and

3

testified while his medicine has helped, it has not completely resolved his problems with paranoia. (Id. at 262-265).

With respect to his typical day, Plaintiff testified that he gets up around 8:00 a.m., puts on his clothing, eats, and then watches television. (Id. at 261). On a function report, Plaintiff reported that his daily activities include cleaning his room, taking a shower, taking his medication, washing dishes, doing the laundry, raking the yard, cooking, paying bills and shopping. (Id. at 102, 104-106). Plaintiff also reported that he enjoys making, writing, and recording music, and that he spends time with his family and plays with his brother. (Id. at 106, 262, 264). In addition, Plaintiff reported that he socializes with others on a daily basis; however, he feels isolated and does like being around a lot of people. (Id., at 106-07).

Plaintiff also reported that since being released from Searcy Hospital[2], he has been interviewed for positions at Family Dollar and Church's Chicken; however, he was not hired because there were no availabilities. (Id., at 263).

---

[2] According to Plaintiff's medical records, Plaintiff was released from Searcy Hospital on April 4, 2008, over 9 months after the reported date of the start of his disability on June 30, 2007. (Tr. 131).

Plaintiff's mother also testified at June 23, 2010 administrative hearing. She reported that in November 2007, Plaintiff began exhibiting weird behavior in that he ran quite a distance to his grandmother's house in the middle of the night and told her that someone had come into the house and killed his family. (Id. at 267). Plaintiff's mother testified that Plaintiff's hands were bloody, apparently from having fallen down, and that he was paranoid and insistent that someone was after him. (Id.). Plaintiff was taken to Knollwood Hospital (Infirmary West) and provided medicine. According to Plaintiff's mother, he would not take the prescribed medication, so, she took him to Mobile Infirmary, where he was hospitalized for a week. Upon his release, Plaintiff still refused to take his medication, and his paranoid behavior continued; thus, his mother petitioned the probate court to have him involuntarily committed to Searcy Hospital. (Id.).

Plaintiff was initially placed at Bay Pointe for a couple of days, and then he was sent on to Searcy Hospital. (Id.). According to Plaintiff's mother, he is currently receiving treatment twice a month at Alapointe, where he is given Risperdal injections because he will not take the pills. Plaintiff's mother testified that the injections have helped to keep him from hearing voices, but he is now in a depressed

state. (Id. at 268).  She testified that Plaintiff is withdrawn, that he hardly leaves his room, and that he sleeps fully dressed in his clothes and his shoes. (Id. at 268-269).  Plaintiff's mother also testified that Plaintiff walks constantly during throughout the night, that he has to be told to take a bath, clean his room and to eat, and that he once had a knife and scissors "at" her other son while he was asleep on the couch. (Id. at 270-271).  Plaintiff's mother further testified that while Plaintiff does not like to socialize and go outside, he keeps up with his doctors' appointments, and will leave home to attend his doctors' appointments. (Id. at 272).  Plaintiff's mother disputed his assertions, made during a doctor's appointment, that he goes jogging and plays pool. (Id. at 273-274).  She also testified that she had to stop working because Plaintiff was constantly calling her at work because he was afraid to be home alone. (Id. at 274).

## IV.  **Analysis**

### A.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is

supported by substantial evidence and 2) whether the correct legal standards were applied.[3] <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  <u>Brown v. Sullivan</u>, F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision.  <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

---

[3] This Court's review of the Commissioner's application of legal principles is plenary. <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

B.   **Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.[4] 20 C.F.R. §§ 404.1520, 416.920.

------------------------------------------------------------

[4] The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since June 30, 2007, and that he has the severe impairments of psychosis (not otherwise specified), polysubstance abuse and antisocial personality disorder. (Tr. 20). The ALJ also found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a full range of work at all exertional levels with some nonexertional limitations. (Id. at 22). The ALJ specifically found that Plaintiff can understand, remember, and carry out simple one and two-step instructions and tasks on a frequent basis and he can understand, remember, and carry out complex instructions and

_____

another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

tasks on an occasional basis. (Id.).  The ALJ further found that Plaintiff is limited to occasional interaction with the general public; can never perform production paced work; must avoid dangerous heights and machinery; and can never climb ladders, ropes, or scaffolds. (Id.).

The ALJ determined that Plaintiff has no past relevant work. (Id. at 26).  Relying on the testimony of the Vocational Expert and the Medical-Vocational Guidelines, the ALJ also determined that considering Plaintiff's RFC and vocational factors such as age, education, and work experience, Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Id. at 27).  Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

### 1. **Medical Evidence**

The relevant medical evidence of record reflects that on November 9, 2007, Plaintiff was taken to the emergency room at Infirmary West Hospital in Mobile, Alabama due to bizarre behavior and his insistence that someone was after him. (Id. at 122, 124).  Confusion was listed as Plaintiff's chief complaint. The medical staff also made a "drug abuse" notation. (Id. at 122).  The ER notes reflect that Plaintiff was confused, agitated and that he had trouble concentrating. (Id.).

10

Plaintiff denied suicidal and homicidal thoughts (id. at 123) but reported visual hallucinations. (Id. at 124). He was diagnosed with anxiety and paranoia, proscribed Ativan, and discharged. (Id. at 123, 125). Upon discharge, his condition was listed as "improved" and "stable". [5] (Id.).

On January 15, 2008, Plaintiff's mother had him involuntarily admitted to Searcy Hospital in Mr. Vernon, Alabama because Plaintiff was insistent that someone was after him, and was not taking his medication. (Id. at 131, 267). According to his mother, Plaintiff was not sleeping, walking around at night and refusing to take his medications because of the side effects. (Id. at 131, 134, 267-268). At the time of admission, Plaintiff's mental status was listed as "oppositional", "defiant", "easily irritable", "angry" and "hostile" and his mood was "loud and threatening." (Id. at 131, 134). Plaintiff reported that people were out to get him; however, he denied hearing voices. (Id.).

---

[5] The records from Searcy also reflect that Plaintiff was admitted to Mobile Infirmary before Thanksgiving due to his bizarre behavior. He was diagnosed with Schizophrenia and treated for four days. Although he was provided medication, he refused to take it and his behavior persisted. While the Searcy notes made reference to the Mobile Infirmary hospitalization, the record before the court does not contain any treatment notes from said hospitalization. (Tr. at 131, 267 ).

Plaintiff's diagnosis upon admission was psychosis (non-specific), alcohol dependence and antisocial personality disorder. (Id.). His GAF score was 20.[6] In Plaintiff's psychiatric evaluation, it was recommended that Plaintiff should be admitted for two months and that at discharge, he should "be able to function in a least restrictive setting." (Id. at 141). Plaintiff was admitted to a structured environment and treated

---

[6] Formerly, the Global Assessment of Functioning (GAF) Scale describes the overall psychological, social, and occupational functioning resulting from mental illness, but without inclusion of any impaired functioning caused by physical or environmental limitations. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th ed. 1994). A GAF score between 11 and 20 reflected some danger of hurting oneself or others (e.g., suicidal attempts without clear expectation of death; frequently violent; manic excitement) (Id.) The most recent edition of the Diagnostic and Statistical Manual, however, no longer recommends the use of the GAF scale, noting that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). Moreover, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders  listing." See Nye v. Commissioner of Social Sec., 2013 U.S. App. LEXIS 15258 (11th Cir. July 26, 2013) ("the Commissioner has noted that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings.").

with different medications, including Risperdal. (Id. at 132).
Upon his discharge on April 4, 2008, Plaintiff's diagnosis was
unchanged; however, his GAF score was 80, and his demeanor was
noted as calm and cooperative. The discharge notes reflect that
Plaintiff experienced no side effects from the medications
during his stay, and he denied depression, suicidal/homicidal
ideations or hallucinations. (Id.).  In addition, Plaintiff was
scheduled for aftercare treatment with AltaPointe Health Care
System's Bridge Team. (Id.).

On April 7, 2013, Plaintiff reported to AltaPointe [7] as
scheduled and was seen by a registered nurse who reported that
Plaintiff reported that his appetite was good and that he was
sleeping well. (Id. at 151).  Plaintiff also denied any
suicidal/homicidal ideations or hallucinations. (Id.).
Plaintiff was also examined by therapist, Jasmin Taylor. (Id. at
148).  Ms. Taylor noted that Plaintiff was stable and
cooperative, that he reported that his sleep was fair, and that
he was logical, coherent and unimpaired. (Id. at 145-148).  She

---

[7] The undersigned observes that some of the records from
Alapointe Health Systems are difficult to read.

noted that the Plaintiff reported that he likes to play basketball and video games and that he enjoys "chill[ing] out". (Id.). She also noted that Plaintiff had a good sense of humor and good leisure interests. (Id. at 150). Ms. Taylor further noted that Plaintiff was stable on his medication and that he was able to "care for himself." (Id. at 150, 146).

Plaintiff presented to AltaPointe on April 30, 2008, to receive his Risperdal injection and Cogentin. (Id. at 143). Nurse Practicioner Danette Overstreet noted that Plaintiff "says things are going well except for his younger brother who is always after him to play" and that Plaintiff says he needs the benztropine because he "fells jumpy sometimes." (Id. at 143). During this visit, Plaintiff denied experiencing any side effects from his medication, denied experiencing any hallucinations and denied experiencing any suicidal/homicidal ideations. Plaintiff reported that since taking his medication he is able to think more clearly. (Id.). Nurse Overstreet noted that Plaintiff reported that he planned to begin his usual summer job working at the local icehouse. (Id.).

From May 28, 2008 through September 2, 2008 [8] Plaintiff

---

[8] The undersigned observes that some of the records from Alapointe Health Systems are difficult to read.

continued receiving bi-weekly medicinal injections and occasional therapy treatment at AltaPointe and reported largely positive results, indicating good sleep and appetite, no concentration impairments and no hallucinations. (Id. at 205-209). On July 21, 2008, Plaintiff reported that he was working with his uncle and denied experiencing any paranoid behavior at all. (Id. at 206). On September 5, 2008, during his AltaPointe visit, Plaintiff saw Dr. Florin Ghelmez, M.D., who noted that Plaintiff's sleep was fair, his insight was sophisticated, and his thought process was logical and coherent. (Id. at 202). Dr. Ghelmez also noted that Plaintiff reported hearing voices, but that he could not make out what they were saying. Dr. Ghelmez observed that "it almost feels to me as if he makes it up . . ." (Id.).

The notes reflect that during Plaintiff's April 3, 2009, visit to AltaPointe, Dr. Ghelmez noted that Plaintiff reported sleep problems while at the same time reporting that he gets at least 10 hours of sleep at night. (Id. at 201). Dr. Ghelmez also noted that Plaintiff had no mood symptoms or psychosis. (Id.). Later, during a July 15, 2009 to AltaPointe, he reported that his sleep was good and questioned whether he needed to continue on his medication. (Id. at 200).

On September 1, 2009, when Plaintiff saw seen again at

15

AltaPointe, he denied experiencing any side effects from his medications and further denied experiencing any psychotic symptoms. He also reported that he was "doing well" and was getting good sleep. (Id. at 199). Plaintiff continued reporting similar results on his visits to AltaPointe throughout September and November of 2009. (Id. at 245-47). During that period, the AltaPointe nursing staff noted that although Plaintiff had agreed to participate in the vocational rehabilitation program to learn job skills, and had signed up for the program, his mother refused to allow him to participate. (Id.). The notes also reflect that Plaintiff reported that he was still playing basketball but that he was tired of just playing basketball all of the time. (Id.).

At the January 1, 2009 AltaPointe visit, Plaintiff's mother reported that he was isolating himself. (Id. at 239). When Plaintiff was questioned about his mother's concern, he denied feeling depressed and said, "I like being by myself." (Id.). Plaintiff also reported that his sleep and appetite was normal. (Id.). Plaintiff also any side effects from his medication (Id.).

The record reflects that Plaintiff continued biweekly appointments at AltaPointe throughout the next several months. (Id., at 226-36). At no time during these visits did Plaintiff

16

report any side effects from his medication. (Id.).   On March 22, 2010, Plaintiff was seen by the physician at AltaPointe, who observed that Plaintiff's behavior was normal and cooperative, his mood was normal and memory and concentration were unimpaired. (Id. at 231-232).

During Plaintiff's May 4, 2010 AltaPointe visit, he again denied any delusions or side effects from his medications. (Id. at 223).   He also reported that "[e]verything been pretty well" and that he had been engaging in several activities such as shooting pool and jogging. (Id.).

The record also reflects that on June 17, 2008, Dr. Ellen V. Eno, Ph.D. reviewed Plaintiff's records and prepared a Mental RFC assessment at the request of the Agency.   She opined that Plaintiff is not significantly limited in most areas of functioning and is only moderately limited in a few areas. (Id. at 152-54).   According to Dr. Eno, Plaintiff is moderately limited in: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods of time, and the ability to interact appropriately with the general public. (Id.).   She further found that Plaintiff has the ability to understand and carry out very short and simple instructions and he can attend to for two-hour intervals.   In

addition, she found that Plaintiff's contact with the general public should be infrequent and casual. (Id. at 154).

Dr. Eno also prepared a Physiatrist Review Technique, in which she diagnosed Plaintiff with antisocial personality disorder and alcohol dependence. (Id. at 163-64). Dr. Eno determined that Plaintiff is moderately limited in the areas of maintaining social functions and maintaining concentration, persistence or pace, and that he is mildly limited in activities of daily living. She also opined that Plaintiff experienced no episodes of decompensation. (Id. at 166). Dr. Eno concluded that Plaintiff's medical evidence does not establish the presence of "C" criteria, as required under § 12.03, mental disorders. (Id. at 167).

On August 8, 2009, the Agency referred Plaintiff to Dr. John W. Davis, Ph.D. for a consultative psychological evaluation. (Id. at 170). Dr. Davis noted that during the evaluation, Plaintiff showed a good degree of cooperation. Plaintiff reported that he is unable to work because he hears voices and due to lack of concentration. (Id.). Plaintiff also reported that his medicine makes him calm but he still hears voices. (Id. at 171). Additionally, Plaintiff reported a good degree of self-sufficiency in his bathing, dressing and feeding, and that he helps with "domestics" and enjoys music. (Id. at

170-173).    Plaintiff  gave  no  indication  of  hallucinations,
delusions,   or   other   perceptual   disturbances   and   his
concentration/attention  and  though  content  was  unimpaired.  (Id.
at  172).    Dr.  Davis  diagnosed  Plaintiff  with  personality
disorder,  antisocial  behavior  and  polysubstance  abuse,  and
opined  that  his  prognosis  was  "fair".  (Id.  at  173).    Dr.  Davis
opined   that   Plaintiff   is   mildly   limited   in   understanding,
remembering  and  carrying  out  simple  instructions,  and  in
interacting   appropriately   with   the   public,   coworkers   and
supervisors.    He  further  opined  that  Plaintiff  is  moderately
limited  in  remembering  and  carrying  out  complex  instructions,
and  that  Plaintiff  would  have  a  favorable  response  to  treatment
within  the  net  six  to  twelve  months  if  he  was  compliant  with  his
treatment  and  if  he  stayed  sober.  (Id.  at  173-176).

     The  Agency  referred  Plaintiff  to  Dr.  John  W.  Davis,  Ph.D.
for  a  second  consultative  psychological  evaluation  on  April  1,
2010.  (Id.  at  211).    Dr.  Davis  noted  that  during  this  visit,
Plaintiff  was  difficult  to  talk  to  and  that   "he  ha[d]  his  own
agenda."  (Id.).    Plaintiff  reported  that  his  medicine  makes  him
calmer  but  that  he  continues  to  hear  voices  and  feel  restless.
(Id.).    Dr.  Davis  noted  no  indications  of  deficits  in
Plaintiff's   overall   concentration   or   attention   and   no
indications  of  hallucinations  or  delusions  or  feelings  of

19

detachment from his environment; however, Plaintiff's judgment and insight were noted as impaired "secondary to a self-centered orientation". (Id. at 212-13).

Dr. Davis administered the WAIS-IV to Plaintiff and noted that his full-scale score was 64, which places his functioning level in the mild range of mental retardation. Dr. Davis opined that the score was an underestimation of Plaintiff's intellectual functioning and that Plaintiff was not putting forth his best effort given that he has a driver's license and is independent in his activities of daily living. (Id. at 213). Dr. Davis also questioned Plaintiff's results on other testing that showed that Plaintiff had a "full blown sociopathic profile", which was not consistent with earlier testing during August 2009. (Id. at 214). Dr. Davis diagnosed Plaintiff with personality disorder (non-specific), malingering and polysubstance abuse, and listed his prognosis as poor. (Id.). Dr. Davis noted that there were strong signs that Plaintiff was malingering to either draw attention to himself for treatment purposes or for the benefit of accessing secondary gains. (Id. at 214).

   **2.   Whether the ALJ erred in finding that Plaintiff does not meet the requirements of Listing 12.03(c)?**

Plaintiff argues that the Commissioner erred in finding that he does not meet the requirements of Listing 12.03 (c). In

response, the Commissioner contends that the ALJ's decision is supported by substantial evidence.   The regulations promulgated by the Commissioner at Appendix 1, Subpart P, set out specific physical and mental conditions that are presumptively disabling. If a claimant meets the requirements of one of the listings, no further proof of disability is required. <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997).   Listing 12.03 provides, in relevant part:

> 12.03 Schizophrenic, paranoid and other psychotic disorders: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
>  * * *
>
>  C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
>    1. Repeated episodes of decompensation, each of extended duration; or
>
>    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C. F. R., Part 404, Subpart P, Appendix 1 (2008).

In his decision, the ALJ found as follows:

> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The "paragraph C" criteria for Listing 12.03 require repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of one or more years of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. However, the medical evidence does not suggest that the claimant has experienced any repeated episodes of decompensation, history of a highly supportive living arrangement, or any risk of decompensation to meet these requirements.

(Id. at 22).

In his brief, Plaintiff contends that he meets the disability requirement of subpart 3 of listing 12.03(c) based on the complete record, including the medical evidence and his mother's testimony that she had to quit her job in order to provide the supportive living arrangement that he requires. (Doc. 14 at 10). Plaintiff also points to his receipt of biweekly Risperdal injections from AltaPointe and his mother's testimony that Plaintiff has to be "made to do simple things

regarding his own person hygiene, such as to take a bath because he will not do it on his own" as additional evidence that he requires a highly supportive living arrangement. (Id.).

Upon consideration, the undersigned finds that while the record reflects that Plaintiff was involuntarily committed to a state hospital for three months in 2008 due to paranoid symptoms, substantial evidence supports the ALJ's decision that Plaintiff is not disabled. In his decision, the ALJ detailed Plaintiff's medical treatment and the weight accorded the medical opinions. As noted by the ALJ, the record reflects that Plaintiff first received emergency treatment in November 2007 due to his belief that someone was "after him". (Tr. 23). Plaintiff was prescribed medication; however, he refused to take it. As a result, he was involuntarily admitted to Searcy Hospital where he received treatment for three months. The hospital records reflect that at the time of Plaintiff's discharge, he was calm cooperative and he reported no side effects from his medications. (Id. at 132). Plaintiff then began receiving treatment from AlaPointe where he has been receiving Risperdal injections every two weeks. (Tr. 141, 151). As noted by the ALJ, the AlaPointe intake reflects that Plaintiff's behavior was cooperative and normal, and that his perceptions, memory, thoughts and concentration were within

normal limit. (Id. at 25).  The ALJ further noted that while
Plaintiff continued to receive the Risperdal injections in 2009
and 2010, the records reflect that he consistently exhibited
normal memory, logical thoughts, good or fair insight and no
anxiety. (Id. at 24).

The ALJ also relied upon and accorded great weight to the
assessments by Dr. Davis and Dr. Eno.  During his consultative
evaluations, Dr. Davis noted that Plaintiff has a good degree of
self-sufficiency in bathing, dressing and feeding himself, and
that although he chooses not to drive, Plaintiff has a driver's
license and is independent in his activities of daily living.
(Id. at 170, 213).  In addition, Dr. Eno found that Plaintiff is
not significantly limited in most areas of functioning and is
only moderately limited in a few areas. (Id. at 152-54).  Ms.
Taylor, a therapist at AltaPointe, further found that when
Plaintiff is on his medication he "can care for himself." (Id.
at 150, 146).

While Plaintiff argues that the ALJ's determination of his
activities of daily living are inconsistent with his mother's
testimony, Plaintiff's medical records, his own testimony at the
administrative hearing and the information in his function
report support the ALJ's determination that Plaintiff does not
require a highly supportive living environment.  With respect to

his typical day, Plaintiff testified that gets up around 8:00 a.m., puts on his clothing, eats and then watches television. (Id. at 261).  On his function report, Plaintiff stated that his daily activities include cleaning his room, taking a shower, taking his medication and washing dishes.  (Id. at 102). Plaintiff further indicated that he has no problems maintaining his personal hygiene and care. (Id. at 103).  Plaintiff stated that he cooks, when he is alone, and is able to clean his bedroom, wash dishes, do his laundry, rake the yard, put out the trash, pay bills and handle his financial affairs and shop for clothing and food. (Id. at  104- 105).

Additionally, the AltaPointe records reflect that the nursing staff opined that Plaintiff was capable of participating in their vocational rehabilitation program to assist him with finding a job and Plaintiff registered for the program; however, his mother refused to let him participate in the program. (Id. at 245, 247).  Further, while Plaintiff and his mother testified at the hearing that his medication makes him excessively drowsy and inhibits his ability to work, the medical treatment records reflect that Plaintiff consistently denied experiencing any side effects from his medication upon being switched to Risperdal in January of 2008. (Id. at 132, 141, 143, 223, 226-36, 235-47). In addition, while his mother testified that he sits in his room

25

in the dark by himself all day long, Plaintiff treatment records indicate that he plays basketball and video games, shoots pool, and goes jogging.[9] (Id. at 146, 223).  This extensive record evidence relied upon by the ALJ clearly belies the testimony of Plaintiff's mother regarding the intensity and limiting effects of Plaintiff's impairments.  Thus, ALJ did not err in finding that the testimony of Plaintiff's mother was not fully credible[10].

Based upon a careful review of all of the evidence in the record, the Court finds that the ALJ properly evaluated and appropriately considered all the evidence, including the testimony of Plaintiff's mother, in finding that Plaintiff is not disabled, and that the ALJ's decision is supported by substantial record evidence.

---

[9] Also noteworthy is the fact that at the administrative hearing, Plaintiff's mother testified that while Plaintiff does not like to socialize and go outside, he keeps up with his own doctors' appointments and gets up to attend his doctors' appointments. (Id. at 272).

[10] "[C]redibility determinations are the province of the ALJ." Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005), and a reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Kalishek v. Commissioner of Soc. Sec., 470 Fed. App'x, 868, 871 (11th Cir. 2012).

**V.      Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income and disability insurance benefits be **AFFIRMED.**

**ORDERED** this **16th** day of **September, 2013.**

                                    /s/ SONJA F. BIVINS
                              **UNITED STATES MAGISTRATE JUDGE**